We'll move now to the final case of the morning, 22-2359 Hightshoe v. Kijakazi, and we're going to begin with oral argument from Mr. Rodman. May it please the court. My name is Jason Rodman, and I represent the appellant Eddie Hightshoe. This case, and I'd like to reserve three minutes for rebuttal, this case is about a father's love. It's also about daily oscillation of symptoms since 2017, every single day. It's also about how to approach cases where there's issues of futility as to constant treatment and going to appointments, and where there's issues of futility in terms of the pace that the brain injured and emotionally damaged climate can handle additional further treatment. There's a lot of fives in my presentation. I'm going to first start with five things, and this is the groundwork for social security disability, and I know that your honors know this, but there's other folks listening, and I will briefly recite those five for that purpose. First, the question is whether substantial gainful activity bars the claim further. Second, there's whether there's a severe impairment or a combination of impairments that are severe. Third is whether a listing is met, so that's a listing that by a completely different rule of law automatically deems that the claimant is disabled. And fourth, what is the residual functional capacity, and can the claimant do the past work based on that residual functional capacity? And then fifth is whether the residual functional capacity allows other full-time sustained work, and I didn't use legal jargon there. That's just one way of characterizing it, that full-time sustained work. In this case, this was the case that was ruled on at step five, but the issues in the case are at step four, which is it's about the residual functional capacity, and here specifically we had a vocational expert testify that a hypothetical employee could have a 10-minute break in unskilled work in the first four hours of a shift, and a 10-minute break in the second four hours of the shift, and an additional one both in the morning and in the afternoon would result in corrective action. Also, the same vocational expert testified that if a hypothetical employee could not sustain full two-hour segments and could not do so reliably, that would eliminate competitive employment. And then the other thing that's at issue in this case is it's another list of five, and here the text is really important, because I believe this may be the first time that your honors on the Seventh Circuit get a chance to apply this new regulation, even if you guys have maybe effectively applied it in a prior case, which I think was Mandrell, even if you didn't explicitly name it. And before I read that text, I want to say that as a general principle, an agency cannot simply do what it wants. An agency is bound by Congress. Congress writes laws. I'm in suspense. You know all of this. I'm not going to go on. I'm in suspense. Tell us what the new regulation is. Thank you, Your Honor. So first, the administrative law judge will consider the persuasiveness of all medical opinions according to five factors. And I'm going to list all five, and then I'm going to focus on the first two. First, supportability, which is the extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation. Second, consistency, which is the extent to which the opinion is consistent with the evidence from other medical sources and non-medical sources in the claim. Third, relationship, and this is will consider the persuasiveness of the relationship with the claimant. Fourth is will consider the persuasiveness of specialization. Fifth is will consider the persuasiveness of other factors. And what are you quoting from? I am quoting from, thank you, Your Honor, 20 CFR 404.1520C. There's no parens around the C. And I pulled those quotes from the opening appellate brief, and specifically sub-letter A. I can find the page. Perhaps, let me ask you, Mr. Rodman. Sure. What does the record tell us about the nature of Mr. Haichu's volunteer work in the community? It tells us that he could not sustain that work once he started at Quick Trip. Let me start again. What does it tell us about what volunteer work he was doing before he began working at Quick Trip then? It tells us that he started out, I believe it was with two mornings and progressed. It started out, I believe, with two mornings or partial days. He gradually expanded that to three. He talked with his doctors about expanding it to four. What was he doing? I think he was a volunteer at a ranch. I think he walked horses in a slow fashion in a circle. And he sometimes had his problem symptoms with that doctor. And then what does the record tell us about why he quit his job at Quick Trip? The record tells us that he only got the job because of his wealth. He was given certain privileges there because of his resume. My question was not how he got the job. My question was what the record tells us about why he quit. The record tells us that he struggled there and he could not perform. He had a probationary period. It was in a manager training. At the end of that probationary period, he was going to have to perform, face the music, and he was not going to be able to hide as much. And it's about his father's love. Everything he did was to maximally protect his daughter. So he quit because he could not perform and he couldn't face the music. And he did not let his manager know his problems because it was his way of maximally protecting his daughter. And he testified to that at hearing. And so from a certain evidentiary perspective, that was already a fact that was established. And so, of course, the employer told exactly what Eddie said he would. She didn't know. Mr. Rodman, would you like to reserve the remainder of your time? I would and there's a lot I didn't cover. Thank you, Your Honor. Thank you very much. We'll now move to Mr. Chadwick for the appellee. May it please the Court. John Chadwick on behalf of the Commissioner of Social Security. Good morning, Your Honors. I'd like to respond first, if I may, to a few of counsel's points. First of all, the ALJ in this case, the Administrative Law Judge, most certainly followed the applicable regulation regarding assessment of medical opinions. That was the regulation counsel was citing and referring to. That regulation specifies that an ALJ only need consider or expressly consider supportability and consistency. The only exception is when the ALJ finds two opinions equally persuasive based on those two factors. Then and only then is she required to go into detail about the other factors, such as the treatment relationship and other factors. But in this case, there were no two opinions that the ALJ found equally persuasive. Thus, there was no need for her to talk about those other factors. Nonetheless, she still did. With respect to the opinion, for instance, most notably of Dr. Morton. Excuse me a minute. The ALJ gave at least five good reasons for finding Dr. Morton's opinion unpersuasive. First, the opinions were unsupported by his own treatment notes, including but not limited to the examination performed in October of 2018, the very same day that he wrote his, quote, off work until re-evaluated, quote, note. The ALJ also considered that Dr. Morton offered little or no support or explanation for the opinions. And third, the opinions were inconsistent with the minimal treatment that Mr. Heitschel received beyond the first five to six months following his injury in February 2017. And it was also inconsistent with an array of activities that Mr. Heitschel was able to do, although the ALJ acknowledged that there were limitations to some of his activities. Fourth, the opinion was, excuse me, the 2019, March 2019 statement was, as the ALJ noted, a statement on an issue reserved for the commissioner. And as such, under the new regulation that counsel points the court to, the ALJ, it was inherently, that statement by Dr. Morton was inherently neither valuable nor persuasive, and the ALJ wasn't even required to discuss it. Do you think, counsel, that a doctor's statement on an issue reserved for the ALJ or the commissioner undermines or hurts that doctor's credibility? And it's just to say, I don't think this guy can do his work. Well, personally, I don't think it undermines or supports the doctor's credibility. I'm not, I would never presume that the doctor is not credible, Your Honor. Yeah, I mean, in these cases, doctors don't know exactly where the legal boundaries are, whose authority is there. I understand that you don't, it's not controlling, it's not, it doesn't deserve any particular weight, but I would hope that it would not undermine a doctor's credibility to offer such an opinion. Well, certainly the ALJ did not focus on that, Your Honor. That was just only one factor that the ALJ considered. She also considered other factors. There is an other factors category in the regulation. She considered that the off-work opinion, or the off-work until re-evaluated in one year statement, didn't talk about or posit permanent restrictions. So that was another reason that the ALJ gave and considered. Now, with respect to the additional hypotheticals that were posited at the hearing by the administrative law judge and responses from the vocational expert, this court has stated that an ALJ need not discuss additional hypotheticals. They are just a matter of means by which an ALJ gathers information, evidence to consider following the hearing. But since the ALJ did not find that Mr. Haichu required those other restrictions, she wasn't required to discuss those additional hypotheticals in her written decision. Moreover, the ALJ did find, in accordance with the prior administrative medical findings, that Mr. Haichu was able to work for two-hour segments of time. That was part of the residual functional capacity that the administrative law judge assessed in accordance with the prior administrative medical findings of the reviewing psychologists. Your Honors, the counsel emphasizes how Mr. Haichu did whatever he could to care for his daughter, presumably in terms of working to obtain health insurance. Absolutely, I sympathize with that. It's very commendable that somebody would take a job thinking of his daughter first, if that person doesn't feel that he can work. But in this case, nothing that the employer issued in response to the administrative law judge's post-hearing inquiry about the work indicated that he wasn't meeting the employer's expectations or that it was an accommodation or subsidized work situation. On that point, Mr. Chadwick, can I ask you about a passage in the ALJ's opinion that concerned me? This is at page 13 of the ALJ's opinion at the top in talking about his job. The ALJ wrote Mr. Haichu's testimony at the third line of that page. His testimony made it appear he was just hired for his mere appearance at a store as he asserted he had little actual duties for his work of nine hours a day with an hour meal break. This is the part that troubled me, but this would be inconsistent with the title of assistant store lead and the rate of pay of $19.43 per hour. Inconsistent with the title and the rate of pay seemed a little troubling to me. It seemed to be giving undue weight and not really responding to Clayman's point that in essence he thought he was getting away with goofing off because of his condition. Well, Your Honor, the ALJ certainly stated a number of things in considering the work activity at Quick Trip. For instance, she noted that although Mr. Haichu claimed that he took multiple as-needed breaks during which he would go sit in the dairy cooler, quote-unquote, or take out the garbage, he did later concede that when he was in the cooler, he did at least some stocking duties while he was in there. The ALJ also noted that the employer didn't corroborate any of Mr. Haichu's assertions that he took extra breaks or that he left work early, and although the employer didn't provide any information directly refuting those, which the ALJ also acknowledged, administrative record pages 20 and 29, the ALJ considered his testimony about rarely, quote-unquote, working the full 40 to 45 hours per week being contradicted by the wage information that was also supplied, showing that he consistently worked 90 hours every two weeks. The ALJ also noted that Mr. Haichu remained in that position for at least five months and that he did quit of his own will and that he wrote that it was due to, quote, personal issues, unquote, in his two-week notice that he gave the employer. I think it's notable, too, that if someone is feeling that poorly, that he would still be able to give two weeks' notice rather than quitting on the spot, but that's just my observation. The ALJ also considered, as I said earlier, Mr. Haichu's testimony about his having taken the job primarily because he needed to supply health insurance for his daughter, but that testimony considered alongside the absence of any medical evidence showing worsening symptoms at that point supported the inference that he could have perhaps even returned to work earlier had he wanted to. And Mr. Haichu provided no medical records supporting the allegation that his condition deteriorated or worsened because of the work activity. I see my time is up, but unless the Court has any additional questions that I may answer, the Commissioner rests on the arguments presented today and the arguments presented in her brief and respectfully asks that the Court affirm the ALJ's decision. Thank you. Thank you very much, Mr. Chadwick. Mr. Rodman, rebuttal. Your Honor, being mindful of my time, I'm going to try and be efficient. I have a lot to pack in. So first off, I would note that if you look at the vocational expert testimony, the vocational expert didn't seem to see the inconsistency the judge saw. I would shift to Dr. Morton. Dr. Morton, in his opinion, he said clearly this gentleman is doing everything he can to optimize his recovery. Dr. Morton is also the guy who noted some things about Botox, noted some different treatment options, worked with him for a long time, got him into different places, kind of talked to him about pace, talked to him about what he should be doing. There's a joke on Reddit right now. I paid my doctor $58 to ask me how many drinks I had this week. Dr. Morton said that he did a free appointment for this guy because he's trying to help him. Just go out there, do what you can. He tried the volunteering. You asked me about what the volunteering involved. At one point, it did involve an hour a month on a board where he had to sit there, and he talked about how the first time he did it, he had trouble doing that hour. And then he also talked about once he started Quick Trip, he couldn't go back and do that board work anymore. He came home, he didn't have the energy. As far as they work at Quick Trip, we know even the cooler stuff was enough for him to win the case in terms of that because he was not the main stalker. He just had to stalk 10 minutes twice a day. There was the freezer that he would hide out in. There was the trash where he actually sat down by the dumpster. He would go visit the kitchen. He had an 8-year-old daughter, and the judge says, oh, well, he can take the 8-year-old daughter out to dinner. Well, yeah, when he was working at Quick Trip, he couldn't come home and cook a meal. He did not have the energy. His 8-year-old daughter was eating with the neighbors or friends. He would take the friend and the daughter out to get some food to make up for that. Ten weeks at Quick Trip, as of the hearing, he still had not done that four-hour training on the register. And we don't know exactly when that happened, but we do know that the 90 is really 40 hours a week. And I defer to my briefing, and I thank you, Your Honors, for your time and consideration. Thank you very much, Mr. Rodman. Thank you, Mr. Chadwick. The case will be taken under advisement. That completes our oral arguments for the day. Court will stand in recess.